FILED
10/1/19 8:56 am
CLERK
U.S. BANKRUPTCY
COURT - WDPA

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Case No. 18-21842-GLT |
| | : | Chapter 7 |
| **STEVEN J. KUBATKA, IV AND** | : | |
| **MICHELLE L. KUBATKA,** | : | |
| | : | |
| *Debtors.* | : | |
| | : | |
| | : | |
| **UNITED STATES TRUSTEE,** | : | |
| | : | |
| *Movant,* | : | Related to Dkt. Nos. 24, 28, 33, 34, 37, 38 |
| | : | |
| v. | : | |
| | : | |
| **STEVEN J. KUBATKA, IV AND** | : | |
| **MICHELLE L. KUBATKA,** | : | |
| | : | |
| *Respondents.* | : | |
| In re: | : | Case No. 18-22233-GLT |
| | : | Chapter 7 |
| **TAMALA M. DELVAL,** | : | |
| | : | |
| *Debtor.* | : | |
| | : | |
| | : | |
| **UNITED STATES TRUSTEE,** | : | |
| | : | |
| *Movant,* | : | Related to Dkt. Nos. 17, 19, 25, 26 |
| | : | |
| v. | : | |
| | : | |
| **TAMALA M. DELVAL,** | : | |
| | : | |
| *Respondent.* | : | |
| | : | File at: |
| In re: | : | Case No. 18-22406-GLT |
| | : | Chapter 7 |
| **DAMIEN W. HARMS AND** | : | |
| **CASEY M. HARMS,** | : | |
| | : | |
| *Debtors.* | : | |

```
_____    :
                                    :
UNITED STATES TRUSTEE,              :
                                    :
            Movant,                 :    Related to Dkt. Nos. 18, 20, 33, 34, 37, 40
                                    :
v.                                  :
                                    :
DAMIEN W. HARMS AND                 :
CASEY M. HARMS,                     :
                                    :
            Respondents.            :
_____    :
```

George M. Conway, Esq.                    Bryan P. Keenan, Esq.
Office of the United States Trustee        Bryan P. Keenan & Associates, P.C.
Philadelphia, PA                           Pittsburgh, PA
Attorney for the United States Trustee     Attorney for the Kubatkas & the Harmses

Kenneth M. Steinberg, Esq.
Steidl & Steinberg
Pittsburgh, PA
Attorney for Delval

## MEMORANDUM OPINION

In three separate chapter 7 cases, the United States Trustee (the "Trustee") filed motions to dismiss pursuant to 11 U.S.C. § 707(b)(3) (the "Motions to Dismiss") seeking dismissal of each case for abuse premised on the respective debtors' (collectively, the "Debtors") alleged ability to repay creditors.[1]  Specifically, the Trustee argues that substantial funds are available by challenging the permissibility of certain expenses—voluntary retirement account contributions, retirement account loan repayments, tuition payments for an adult child, and student loan payments—from being considered in the calculation of the Debtors' available monthly disposable

---

[1]      Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific sections shall be to the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23, 11 U.S.C. § 101, *et seq*. All references to "Bankruptcy Rule" shall be to the Federal Rules of Bankruptcy Procedure.

income rather than as payments to be made from it.  In one case, the Trustee also objects to a vehicle maintenance expense where the Debtors have also listed a projected new car payment.  In essence, the Trustee asserts that the Debtors are either inappropriately diverting funds from their general unsecured creditors, or unfairly discriminating among them.  For the reasons set forth below, the Court will deny the *Motions to Dismiss* in the cases filed by the Kubatkas and Delval, but will afford the Harmses a brief opportunity to consider conversion before dismissing their case.

## I.      BACKGROUND

In each of these cases, the Trustee moved to dismiss for abuse after the chapter 7 trustee filed a report of no distribution, indicating that there were no assets available for distribution to creditors.  The *Motions to Dismiss* were heard separately and taken under advisement in the ordinary course.  No party requested an evidentiary hearing, leaving the Court to draw facts from the bankruptcy schedules and uncontested representations.[2]  Review of the *Motions to Dismiss* was subsequently consolidated in light of the common issues presented.  After an initial examination, the Court ordered additional briefing with respect to the following two questions:

(1)    Whether <u>Anes v. Dehart (In re Anes)</u>, 195 F.3d 177, 181 (3d Cir. 1999), was abrogated by the enactment of section 541(b)(7) and 1322(f) of the Bankruptcy Code?  and

(2)    What is the impact of sections 541(b)(7) and 1322(f), if any, on an ability to pay analysis performed under section 707(b)(3)?[3]

Briefs and rebuttal briefs followed.  The matter is now ripe for determination.

### A.      Steven J. and Michelle L. Kubatka, Case No. 18-21842-GLT

---

[2]    The Court takes judicial notice of the docket events in this case as well as the contents of the Debtors' schedules.  <u>U.S. Trustee v. Stone Fox Capital LLC (In re Stone Fox Capital LLC)</u>, 572 B.R. 582, 592 n.3 (Bankr. W.D. Pa. 2017).

[3]    <u>See</u>, <u>e.g.</u>, *Order*, Case No. 18-21842-GLT, Dkt. No. 30.

Steven J. and Michelle L. Kubatka (the "Kubatkas") filed a voluntary chapter 7 petition on May 6, 2018. The filing was prompted by Mrs. Kubatka having suffered a complicated pregnancy that left her unable to work for well over a year.[4] On Schedule E/F, they listed nonpriority unsecured debts totaling $110,164.83, of which $85,516 are nondischargeable student loan debts and $24,648.83 are general unsecured claims.[5]

Mrs. Kubatka returned to work as a nurse eight months prior to the petition date, while Mr. Kubatka remained home for the past two years to care for their three children, aged 2, 10, and 12.[6] The Kubatkas are below-median income debtors and were not required to complete the Chapter 7 Means Test Calculation (the "Means Test").[7] On Schedule I, they reported gross monthly income of $8,612.50 which, after monthly payroll deductions including $258.38 for voluntary retirement contributions, leaves $6,634.42.[8] On Schedule J, they listed expenses totaling $6,734.72. The expenses included a monthly automobile maintenance expense for a 2010 Nissan Frontier in the amount of $291.66, a "projected car payment" in the amount of $400, and a monthly student loan expense in the amount of $515.[9] Deducting all monthly expenses from their income yields *negative* monthly net income in the amount of $100.30.[10]

The Trustee filed a motion to dismiss, asserting that the voluntary retirement contributions, the monthly maintenance expense for the Nissan (to the extent that they also claim a "projected car payment"), and the monthly student loan payments are inappropriate expenses

---

[4] *Debtor's Response to the United States Trustee Motions to Dismiss Case Filed Pursuant to 11 U.S.C. [sic] by the United States Trustee*, Case No. 18-21842-GLT, Dkt. No. 28 at 2.

[5] *Schedule E/F: Creditors Who Have Unsecured Claims*, Case No. 18-21842-GLT, Dkt. No. 1 at 20-29.

[6] *Schedule I: Your Income*, Case No. 18-21842-GLT, Dkt. No. 21-1 at 1.

[7] *Chapter 7 Statement of Your Current Monthly Income*, Case No. 18-21842-GLT, Dkt. No. 1 at 46-47.

[8] *Schedule I: Your Income*, Case No. 18-21842-GLT, Dkt. No. 21-1 at 2.

[9] *Schedule J: Your Expenses*, Case No. 18-21842-GLT, Dkt. No. 21-1 at 4.

[10] Id.

and must be considered disposable income.[11]   As a result, the Trustee contends the Kubatkas

actually have *positive* monthly net income in the amount of $964.74.[12]   Thus, given the total

amount of unsecured debt reported on their schedules, the Trustee concluded that the Kubatkas

could pay $34,730.64 through a thirty-six month chapter 13 plan and provide a 31% dividend to

unsecured creditors.[13]

In their response, the Kubatkas explained that their bankruptcy was filed in good

faith.[14]

### B.      Tamala M. Delval, Case No. 18-22233-GLT

Tamala M. Delval ("Delval") filed a voluntary chapter 7 petition on May 31, 2018.

She did not explain what motivated her filing, and the reason (beyond the existence of

debt) is not apparent from her schedules.   On Schedule E/F, she listed nonpriority unsecured debts

totaling $64,650.69, of which $13,963.87 are nondischargeable student loan debts and $50,686.82

are general unsecured claims.[15]   Delval's seventeen non-student loan creditors consist largely of

consumer credit accounts she used for living expenses.[16]

Delval is a single mother with a twenty-one year old daughter as her sole

dependent.[17]   For the last thirty years, she worked as a client services specialist at a life insurance

---

[11]     *Motion to Dismiss Case Pursuant to 11 U.S.C. Sec. 707(b)(3) by the United States Trustee*, Case No. 18-
21842-GLT, Dkt. No. 24.

[12]     Id. at 4.

[13]     Id.   The Trustee further calculates that unsecured creditors could receive a 52% dividend though a plan with
a sixty-month term.   Id.

[14]     *Debtor's Response to the United States Trustee Motions to Dismiss Case Filed Pursuant to 11 U.S.C. [sic]
by the United States Trustee*, Case No. 18-21842-GLT, Dkt. No. 28.

[15]     *Schedule E/F: Creditors Who Have Unsecured Claims*, Case No. 18-22233-GLT, Dkt. No. 11-1 at 14-21.

[16]     Id.   To further put this in perspective, three account balances are over $10,000, one exceeds $4,000, and three
are over $1,000.

[17]     *Schedule I: Your Income*, Case No. 18-22233-GLT, Dkt. No. 14 at 1.

company, earning a gross income of $5,908 per month.[18]  Over the past year, she also worked a

second job as a greeter for an event services company for an additional $340 per month.[19]

Delval completed the Means Test with no presumption of abuse arising.[20]  On

Schedule I, Delval listed a voluntary contribution to a retirement plan in the amount of $177 and

a retirement account loan repayment in the amount of $696 as monthly payroll deductions.[21]  After

all other payroll deductions, her monthly income was $3,276.[22]  On Schedule J, she listed monthly

expenses totaling $3,332, including expenses for books and tuition in the amounts of $75 and $100,

respectively.[23]  After deducting all monthly expenses from her income, Delval reported *negative*

monthly net income in the amount of $56.[24]

The Trustee moved to dismiss, objecting to Delval's voluntary retirement

contributions, retirement account loan repayments, and educational expenses and insisting they all

be counted as disposable income.[25]  In effect, the Trustee argued that Delval has *positive* monthly

net income in the amount of $977, which could yield a dividend of over 90% to her unsecured

creditors if paid into a chapter 13 plan over a term of sixty months.

In response, Delval recognized these expenses may not be "allowable," but argued

that in reality these funds are not available to her to repay her creditors.[26]  At oral argument, she

---

[18]    Id.

[19]    Id. at 2.

[20]    *Chapter 7 Means Test Calculation*, Case No. 18-22233-GLT, Dkt. No. 11-1 at 41-49.

[21]    *Schedule I: Your Income*, Case No. 18-22233-GLT, Dkt. No. 14 at 2.

[22]    Id.

[23]    *Schedule J: Your Expenses*, Case No. 18-22233-GLT, Dkt. No. 14 at 7.

[24]    Id.

[25]    *Motion to Dismiss Case Pursuant to 11 U.S.C. Sec. 707(b)(3) by the United States Trustee*, Case No. 18-22233-GLT, Dkt. No. 17.  In the motion, the Trustee also argued that the Delval's income was subject to excessive tax withholding, but this position was abandoned at oral argument.

[26]    *Debtor's Response to Trustee's Motion to Dismiss*, Case No. 18-22233-GLT, Dkt. No. 19.

explained that she borrowed approximately $24,000 from her retirement account years ago to pay off higher interest credit card debt and pay $5,800 towards her daughter's tuition at Robert Morris University.[27]

### C.    Damien W. and Casey M. Harms, Case No. 18-22406-GLT

Damien W. and Casey M. Harms (the "Harmses") filed a voluntary chapter 7 petition on June 14, 2018.  On Schedule E/F, they listed nonpriority unsecured debts totaling $117,679.70, of which $63,663.93 are nondischargeable student loan debts and $54,015.77 are general unsecured claims.[28]  They also listed a priority debt for 2017 taxes owed to the Internal Revenue Service in the amount of $1,326.80.[29]

The present bankruptcy was motivated by Mrs. Harms' loss of employment in 2017 which resulted in a 36% reduction in the household gross income.[30]  Initially, the Harmses used credit cards to make up the difference but eventually they became over extended.[31]  Mrs. Harms returned to work as an office manager seven months prior to filing the bankruptcy petition, while Mr. Harms has been employed as a technology analyst for the last three years.[32]  Together, they have a four year old son.[33]

---

[27]    In light of the chapter 7 trustee's no asset report, the Court presumes that the payment to Robert Morris University was outside the time period in which transfers may be avoided.

[28]    *Schedule E/F: Creditors Who Have Unsecured Claims*, Case No. 18-22406-GLT, Dkt. No. 1 at 20-26.

[29]    Id. at 20.

[30]    *Debtor's Response to the United States Trustee Motions to Dismiss Case Filed Pursuant to 11 U.S.C. [sic] by the United States Trustee*, Case No. 18-22406-GLT, Dkt. 20 at 4.

[31]    Id.

[32]    *Schedule I: Your Income*, Case No. 18-22406-GLT, Dkt. No. 1 at 29.

[33]    Id.

The Harmses completed the Means Test with no presumption of abuse.[34]   On Schedule I, they listed monthly income in the amount of $5,070 after taking various payroll deductions, including voluntary contributions for retirement plans totaling $210.86.[35]   On Schedule J, the Harmses listed monthly expenses totaling $5,105.12, of which child care was by far the biggest cost at $1,083.33.[36]   They also listed $75 for an "IRS repayment plan" and two student loan payments totaling $515.[37]   After deducting all monthly expenses from their income, the Harmses reported *negative* monthly net income in the amount of $34.52.[38]

The Trustee filed a motion to dismiss, targeting the voluntary retirement contributions, the prepetition tax payments, and the monthly student loan payments.[39]   If these items are reclassified as disposable income (as the Trustee urged), the Harmses would have *positive* monthly net income in the amount of $766.34.   Accordingly, if these funds were devoted to a chapter 13 plan, the Harmses could pay their unsecured creditors a dividend of approximately 39% over sixty months.

The Harmses responded generally, asserting that the Trustee is seeking to impose an alternative means test where the Code does not presume abuse.[40]

## II.   JURISDICTION

---

[34]   *Chapter 7 Means Test Calculation*, Case No. 18-22406-GLT, Dkt. No. 1 at 46-54.

[35]   *Schedule I: Your Income*, Case No. 18-22406-GLT, Dkt. No. 1 at 30.

[36]   *Schedule J: Your Expenses*, Case No. 18-22406-GLT, Dkt. No. 1 at 32.  Notably, the Harmses do not list a monthly expense for telephone, cell phone, internet, satellite, and cable services.

[37]   Id.

[38]   Id.

[39]   *Motion to Dismiss Case Pursuant to 11 U.S.C. Sec. 707(b)(3) by the United States Trustee*, Case No. 18-22406-GLT, Dkt. No. 18.

[40]   *Debtor's Response to the United States Trustee Motions to Dismiss Case Filed Pursuant to 11 U.S.C. [sic] by the United States Trustee*, Case No. 18-22406-GLT, Dkt. 20.

This Court has authority to exercise jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 157(a), 1334, and the Order of Reference entered by the United States District Court for the Western District of Pennsylvania on October 16, 1984.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

## III.    POSITIONS OF THE PARTIES

### A.    The United States Trustee

The Trustee argues that in each of these cases, the totality of the circumstances of the Debtors' financial situations demonstrate abuse under section 707(b)(3)(B).  Although he recites a litany of factors that courts consider in this analysis, the Trustee only focuses on the reasonable necessity of certain expenses and how that might impact the Debtors' ability to repay their respective unsecured creditors.

To start, the Trustee asserts that the United States Court of Appeals for the Third Circuit in *Anes v. Dehart*[41] is "the leading case in the Third Circuit addressing the intersection between retirement accounts and 'disposable income.'"[42]  He explains that the Third Circuit held that voluntary retirement contributions and retirement account loan repayments "should not be deducted from disposable income under section 1325"[43] based upon its determination that those payments "were not reasonably necessary for the support and maintenance of the debtor."[44] Although *Anes* was a chapter 13 case, the Trustee contends that the analysis has been extended to

---

[41]    Anes v. Dehart (In re Anes), 195 F.3d 177, 181 (3d Cir. 1999).

[42]    See, e.g., *Memorandum in Support of Motions to Dismiss Case(s) by the United States Trustee*, Case No. 18-21842-GLT, Dkt. No. 33 at 2.

[43]    See, e.g., *Motion to Dismiss*, Case No. 18-21842-GLT, Dkt. No. 24 at ¶ 8.

[44]    See, e.g., *Memorandum in Support of Motions to Dismiss Case(s) by the United States Trustee*, Case No. 18-21842-GLT, Dkt. No. 33 at 3.

chapter 7 cases, with courts such as *In re Lenton*[45] and *In re Harshaw*[46] finding retirement contributions and mandatory retirement loan repayments are not reasonable and necessary expenses.

The Trustee insists that *Anes* has not been abrogated and remains good law despite subsequent amendments to the Bankruptcy Code.  Although he concedes that sections 541(b)(7) and 1322(f) represent "new protections for retirement funds that did not exist under [prior] law,"[47] he argues that these provisions apply only to chapter 13 and that "it is absolutely clear that Congress did not intend it to apply universally throughout the Bankruptcy Code."[48]   To the contrary, the Trustee urges that

> it would be anomalous and improper to infer a change in the application of what is reasonably necessary support for a debtor in chapter 7 where there is both a clear expression to make it harder for debtors to file chapter 7 and a specific reference to chapter 13 involving sole provisions which address disposable income.

> *Congress' clear expression was that in chapter 13 proceedings only, repayments of loans and contributions to retirement accounts should not be included in the determination of what chapter 13 debtors need to meet the disposable income test.* Congress was not addressing the overall concept of what is reasonably necessary support for debtors in chapter 7. By specifically identifying the chapter which was implicated in what would be excluded from the definition of disposable income (chapter 13), Congress was not overruling the <u>Anes</u> analysis of what is reasonably necessary for debtor's support. This distinction is sound and reasonable as it highlights the difference between the different chapters.[49]

---

[45]    <u>In re Lenton</u>, 358 B.R. 651 (Bankr. E.D. Pa. 2006).

[46]    <u>U.S. Trustee v. Harshaw (In re Harshaw)</u>, 345 B.R. 518 (Bankr. W.D. Pa. 2006).

[47]    <u>See</u>, <u>e.g.</u>, *Memorandum in Support of Motions to Dismiss Case(s) by the United States Trustee*, Case No. 18-21842-GLT, Dkt. No. 33 at 7.

[48]    <u>Id.</u> at 4.

[49]    <u>Id.</u> at 7-8 (emphasis added).

Accordingly, he concludes that sections 541(b)(7) and 1322(f) have no impact on the analysis of a debtor's ability to pay under the totality of the circumstances pursuant to section 707(b)(3).

Next, the Trustee asserts that monthly student loan repayments "should not be considered in determining [a debtor's] available *disposable income*."[50]  In a subsequent pleading, however, he shifts his characterization of the issue as focusing on "[w]hether student loan obligations are reasonably necessary for the support and maintenance of the debtor," noting that the "concept of 'disposable income' . . . is simply not applicable to chapter 7 proceedings."[51]  The Trustee contends that the crux of the issue is that student loans are not a preferred class of debts entitled to special treatment.  Rather, they are unsecured claims, albeit nondischargeable ones, that should be paid an equal distribution to other similarly situated unsecured creditors.

Because the *Motion to Dismiss* does not specifically say, the Court infers the Trustee argues that the Harmses' expense for prepetition tax claims cannot be deducted from the amount available to be paid to unsecured creditors for essentially the same reason.[52]

Although Delval does not have a student loan expense, the Trustee asserts that she should not be permitted to provide for an adult child's private education absent special needs or circumstances.  In support, he cites several cases which stand for the proposition that private school tuition is a "luxury" that is not reasonably necessary for a debtor's support.[53]

---

[50]     See, e.g., *Motion to Dismiss*, Case No. 18-21842-GLT, Dkt. No. 24 at ¶ 9 (emphasis added).

[51]     See, e.g., *Memorandum in Response to Debtors' Supplemental Brief by United States Trustee*, Case No. 18-21842-GLT, Dkt. No. 37 at 1-2.

[52]     Neither the *Motion to Dismiss* nor any of the supplemental briefs filed specifically address this point.

[53]     See Educ. Credit Mgmt. Corp. v. Savage (In re Savage), 311 B.R. 835, 841 (B.A.P. 1st Cir. 2004); Watson v. Boyajian (In re Watson), 309 B.R. 652, 660 (B.A.P. 1st Cir. 2004), aff'd, 403 F.3d 1 (1st Cir. 2005); In re Stout, 336 B.R. 138 (Bankr. N.D. Iowa 2006); In re Savoie, No. 05-13263 DWS, 2005 WL 2476268, at *3 (Bankr. E.D. Pa. Oct. 6, 2005).

Finally, the Trustee objects to the Kubatkas' monthly maintenance expense for the Nissan to the extent that they also deduct a "projected car payment."  He does not explain his reasoning, but it appears premised on the idea that a second vehicle's expenses are not reasonable and necessary for the Kubatkas' support.

## B.    The Debtors[54]

Generally speaking, the Debtors view of this dispute is highly intertwined with the Means Test, with each contending it is necessary to discern the plain meaning of sections 707(b)(2) and (b)(3).[55]  They posit that because initial determinations of bad faith fall within section 707(b)(2), debtors who "pass" the Means Test necessarily establish their statutory eligibility for chapter 7 relief.[56]  Although the Debtors concede that bad faith and ability to pay are appropriate considerations under section 707(b)(3),[57] they argue that the totality of the circumstances should not be applied in a manner that reaches a result inconsistent with the policies of the Means Test.[58]  Indeed, the Debtors assert that by enacting the Means Test, "Congress set specific guidelines for who should be determined to pay debts . . . *intend[ing] not only to catch abusers, but also to protect debtors.*"[59]  As such, they reason that "Congress' decision not to categorically exclude any

---

[54]    For simplicity, the Court will not make distinctions among the respective Debtors' arguments unless they expressly took different positions on an issue, or an issue only applies to one and not the others.

[55]    See, e.g., *Debtors' Rebuttal Brief Relating to the UST's Motion to Dismiss Cases Under 11 USC [sic] 707(b)(3)*, Case No. 18-21842-GLT, Dkt. No. 38 at 3.

[56]    See, e.g., *Debtors' Supplemental Brief Relating to the UST's Motion to Dismiss Cases Under 11 USC [sic] 707(b)(3)*, Case No. 18-21842-GLT, Dkt. No. 34 at 7.

[57]    See, e.g., *Debtors' Rebuttal Brief Relating to the UST's Motion to Dismiss Cases Under 11 USC [sic] 707(b)(3)*, Case No. 18-21842-GLT, Dkt. No. 38 at 3-5, 9.

[58]    Id. at 9.

[59]    See, e.g., *Debtors' Supplemental Brief Relating to the UST's Motion to Dismiss Cases Under 11 USC [sic] 707(b)(3)*, Case No. 18-21842-GLT, Dkt. No. 34 at 11 (emphasis in original).

specific expense . . . from being considered reasonably necessary is probative of its intent"[60] not

to place any prohibitions on how the household income of below median income debtors is used.[61]

Therefore, the Debtors insist that the Trustee is seeking to impose an "alternative means test other

than that enacted by Congress" in bad faith to further its own policy directives.[62]

In support of their "alternative means test" theory of the *Motions to Dismiss*, the

Debtors argue that the Trustee seeks dismissal solely based on an alleged ability to pay and without

regard to the totality of the circumstances.[63]  They contend that even if a debtor's ability to pay is

the most important factor under section 707(b)(3)(B), it is still not a bright-line test.[64]  To the

contrary, the Debtors assert that the totality of the circumstances requires consideration of the

unique facts of the case, demanding that the Trustee show more than just a debtor's ability to pay

to establish abuse.[65]

Although the Debtors agree that the consideration of the totality of the

circumstances has always been part of the section 707(b) analysis and that pre-2005 case law may

remain instructive,[66] they deny that *Anes* is dispositive regarding the retirement account expenses

in this case.  The Kubatkas and the Harmses urge that *Anes* was abrogated by the enactment of

sections 541(b)(7) and 1322(f) which they say, taken together, exclude voluntary retirement

contributions and retirement account loan repayments from the calculation of projected disposable

---

[60]     See, e.g., Id. at 7; *Debtors' Rebuttal Brief Relating to the UST's Motion to Dismiss Cases Under 11 USC [sic] 707(b)(3)*, Case No. 18-21842-GLT, Dkt. No. 38 at 9.

[61]     See, e.g., *Debtors' Supplemental Brief Relating to the UST's Motion to Dismiss Cases Under 11 USC [sic] 707(b)(3)*, Case No. 18-21842-GLT, Dkt. No. 34 at 6.

[62]     Id. at 11.

[63]     See, e.g., *Debtors' Rebuttal Brief Relating to the UST's Motion to Dismiss Cases Under 11 USC [sic] 707(b)(3)*, Case No. 18-21842-GLT, Dkt. No. 38 at 8.

[64]     Id.

[65]     Id.

[66]     Id. at 3-4.

13

income in chapter 13.[67]  In contrast, Delval suggests that *Anes* "might still stand," but recognizes that "it shows its age" when one considers that the disparate treatment advanced by the Trustee would yield "theoretical" disposable income in chapter 7, with no real income to render a chapter 13 feasible.[68]

Turning to student loan payments, the Kubatkas and the Harmses characterize the Trustee's argument that such funds must be considered disposable income for purposes of section 707(b)(3)(B) as "specious."[69]  They emphasize that Congress has afforded student loan creditors preferred treatment by making student loans nondischargeable unless a debtor overcomes the high burden of demonstrating that repayment would impose an undue hardship.[70]  Noting that the national student loan debt has tripled in the past decade, the Kubatkas and the Harmses assert that the Trustee's position would only fuel the present "crisis."[71]  Moreover, they argue that because they were already required to exclude student loan payments from the Means Test calculation, counting them as disposable income under section 707(b)(3)(B) would be inconsistent with the result obtained under section 707(b)(2).[72]

For her part, Delval asserts that the amount of money she is paying towards her child's college education is minimal and not significant under the totality of the circumstances.[73]

---

[67]  See, e.g., *Debtors' Supplemental Brief Relating to the UST's Motion to Dismiss Cases Under 11 USC [sic] 707(b)(3)*, Case No. 18-21842-GLT, Dkt. No. 34 at 3-6.

[68]  *Debtor's Response to United States Trustee's Memorandum in Support of Motions to Dismiss*, Case No. 18-22233-GLT, Dkt. No. 26 at 2-3.

[69]  See, e.g., *Debtors' Supplemental Brief Relating to the UST's Motion to Dismiss Cases Under 11 USC [sic] 707(b)(3)*, Case No. 18-21842-GLT, Dkt. No. 34 at 9.

[70]  Id. at 8.

[71]  Id. at 8, 11.

[72]  Id. at 12.

[73]  *Debtor's Response to Trustee's Motion to Dismiss*, Case No. 18-22233-GLT, Dkt. No. 19 at ¶¶ 10-12.

To the extent the Trustee challenges the Harmses' characterization of their IRS repayment plan as an expense, they simply respond that it is priority debt.[74]

Finally, at oral argument, the Kubatkas defended the need for both a vehicle maintenance payment and a projected car payment, stating that they presently only have one vehicle for a family of five and will soon need another given that Mrs. Kubatka will be returning to work as a traveling nurse.

## IV.    DISCUSSION

From the outset, it is apparent that the parties do not fully understand the issues presented by the *Motions to Dismiss*.  Despite substantial briefing, their arguments have been fluid, difficult to parse, and often conflate distinct concepts.  All of this necessarily required the Court to take a much more detailed approach to ensure that going forward both the United States Trustee and all debtors' counsel comprehend the standards applicable to section 707(b)(3)(B).

### A.    <u>Standards for Dismissal under Section 707(b)</u>

Section 707(b)(1) of the Bankruptcy Code permits the Court to, after notice and a hearing, dismiss a chapter 7 case filed by an individual debtor whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to one under either chapter 11 or 13, if granting chapter 7 relief would be an "abuse."[75]  "Abuse" is not defined by the statute.  As a result, courts have developed various approaches to help guide the determination of when a chapter 7 filing is abusive.  Notably, section 707(b) was extensively amended as part of the Bankruptcy

---

[74]    *Debtor's Response to the United States Trustee Motions to Dismiss Case Filed Pursuant to 11 U.S.C. [sic] by the United States Trustee*, Case No. 18-22406-GLT, Dkt. 20 at 4.

[75]    11 U.S.C. § 707(b)(1).  There is no dispute in this case that the Debtors' respective debts are primarily "consumer debts" as that term is defined in 11 U.S.C. § 101(8).

Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), introducing new statutory benchmarks and displacing some of the older judicially-created concepts.  Although the specific provision relevant to the matters before the Court, section 707(b)(3), was among the new standards added by BAPCPA, the present dispute in many ways centers on the continued vitality of pre-BAPCPA concepts, requiring a discussion of the evolution of section 707(b).

Pre-BAPCPA, section 707(b)(1) provided in relevant part:

> After notice and a hearing, the court, on its own motion or on a motion by the United Satets trustee, but not at the request or suggestion of any party in interest, *may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter.*  There shall be a presumption in favor of granting the relief requested by the debtor. . . .[76]

While courts struggled with the undefined nature of "abuse," there was at least universal acceptance that a debtor's ability to repay creditors was a factor.[77]  Historically, the relative weight afforded to a debtor's ability to repay creditors in the overall analysis varied, with three approaches emerging from the circuit courts.[78]  The United States Courts of Appeal for the Eighth and Ninth Circuits adopted a "*per se*" approach by which the debtor's ability to repay debts alone was evidence of abuse and justified dismissal.[79]  In contrast, the United States Court of Appeals for the Fourth Circuit, noting the express statutory presumption "in favor of granting the relief requested

---

[76]     11 U.S.C. § 707(b) (1998).

[77]     See U.S. Trustee v. Harshaw (In re Harshaw), 345 B.R. 518, 522 (Bankr. W.D. Pa. 2006) ("Largely on the basis of such legislative history, courts have uniformly held that a debtor's ability to repay his debts or, more aptly, to fund a Chapter 13 plan is, at a minimum, a factor or circumstance that is indicative of whether "substantial abuse" would result from a discharge.").

[78]     See In re Sivaram, 564 B.R. 270, 273 (Bankr. W.D. Pa. 2017); In re Cribbs, 387 B.R. 324, 333-34 (Bankr. S.D. Ga. 2008).

[79]     In re Walton, 866 F.2d 981, 985 (8th Cir. 1989); Zolg v. Kelly (In re Kelly), 841 F.2d 908, 914 (9th Cir. 1988).

by the debtor,"[80] devised a "totality of the circumstances" test requiring something more than just an ability to pay.[81] Embracing the middle ground, the United States Courts of Appeal for the First and Sixth Circuits articulated a so-called "hybrid"[82] approach whereby ability to pay is the primary, but not necessarily conclusive, factor thereby permitting the debtor to demonstrate mitigating circumstances.[83]

In addition to the general consensus that an ability to repay creditors was a factor in determining substantial abuse, courts also agreed that an ability to pay assessment required a review of the debtor's budget for unreasonable and excessive expenses.[84] Some viewed it as

---

[80]   11 U.S.C. § 707(b) (1998).

[81]   Green v. Staples (In re Green), 934 F.2d 568, 572 (4th Cir. 1991) (the totality of the circumstances requires consideration of "(1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment; (2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay; (3) Whether the debtor's proposed family budget is excessive or unreasonable; (4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and (5) Whether the petition was filed in good faith.")

[82]   See In re Sivaram, 564 B.R. at 273; In re Cribbs, 387 B.R. at 334.

[83]   First USA v. Lamanna (In re Lamanna), 153 F.3d 1, 5 (1st Cir. 1998) ("We hold that a bankruptcy court may, but is not required to, find 'substantial abuse' if the debtor has an ability to repay, in light of all of the circumstances."); In re Krohn, 886 F.2d 123, 126–27 (6th Cir. 1989) ("Among the factors to be considered in deciding whether a debtor is needy is his ability to repay his debts out of future earnings. That factor alone may be sufficient to warrant dismissal. For example, a court would not be justified in concluding that a debtor is needy and worthy of discharge, where his disposable income permits liquidation of his consumer debts with relative ease. Other factors relevant to need include whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities.").

[84]   See In re Harshaw, 345 B.R. at 524 ("the Court rejects as nonsensical, if not downright outrageous, the Debtors' position that the Court cannot, when conducting a § 707(b) substantial abuse analysis, consider, for purposes of assessing future ability to repay debts, those savings that the Debtors have realized from their own post-petition reductions in monthly expenditures . . ."); U.S. Trustee v. Wiedner (In re Wiedner), 344 B.R. 321, 326 (Bankr. M.D. Pa. 2005) ("I will initiate my review of 'reasonable and necessary' expenses by comparing the debtor's actual expenses with the national criteria found in the Internal Revenue Service, Collection Financial Standards for Food, Clothing and other items, as well as the housing and utility allowance for the county and state applicable and the allowable living expense for transportation"); In re Watkins, 216 B.R. 394, 396 (Bankr. W.D. Tex. 1997) ("The Debtors' proposed family budget is unreasonable and excessive for the following reasons . . ."); U.S. Trustee v. Duncan (In re Duncan), 201 B.R. 889, 895 (Bankr. W.D. Pa. 1996) (considering "whether [the debtor's] expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities").

simply an inherent component of determining whether the chapter 7 filing would constitute a substantial abuse as the diversion of income towards luxuries would be unfair to creditors.[85] Others expressly considered the ability to pay in the context of a hypothetical chapter 13,[86] where section 1325(b)(2) defined "disposable income" for plan purposes as "income which is received by the debtor and which is *not reasonably necessary to be expended . . .* for the maintenance and support of the debtor or a dependent of the debtor . . ."[87]   Thus, regardless of whether the "disposable income" considerations were intentionally incorporated into a section 707(b) analysis, courts routinely discounted expenses that were not "reasonably necessary" for the debtor's maintenance and support.[88]   Usually, what was reasonable and necessary was a highly factual question that, depending on the debtor's circumstances, could result in the court reducing or eliminating an expenditure and counting the difference towards the funds available for repayment.[89]   Some expenses, however, were considered categorically unreasonable.[90]

---

[85]    See In re Harshaw, 345 B.R. at 524; In re Wiedner, 344 B.R. at 326; U.S. Trustee v. Georgiu (In re Georgiu), 344 B.R. 47, 49 (Bankr. M.D. Pa. 2005); In re Beharry, 264 B.R. 398, 403 (Bankr. W.D. Pa. 2001).

[86]    See, e.g., Stuart v. Koch (In re Koch), 109 F.3d 1285, 1288 (8th Cir. 1997); but see In re Wiedner, 344 B.R. at 326 ("I find little rationale why eligibility for Chapter 13 relief should play any greater of a role than eligibility for Chapter 11").

[87]    11 U.S.C. § 1325(b)(2)(A) (1998) (emphasis added).

[88]    See In re Georgiu, 344 B.R. at 49 ("The key issue is whether the Debtor has an income stream that exceeded his reasonable and necessary expenses."); In re Hoffman, 413 B.R. 191, 197 (Bankr. M.D. Pa. 2008) (housing expense of $2,338.00 was excessive where the only justification for keeping a property in which the debtor had no equity was pride); In re Beharry, 264 B.R. at 403 (expenses reflected on Schedule J were unreasonably high).

[89]    See, e.g., In re Harshaw, 345 B.R. at 525 (for purposes of a section 707(b) analysis, debtors are legally compelled to reduce excessive and unreasonable monthly expenditures); In re Wiedner, 344 B.R. at 327 (reduction of debtor's actual expenses to the national criteria found in the Internal Revenue Service, Collection Financial Standards for Food, Clothing and other items); In re Duncan, 201 B.R. at 896 (debtor's proposal to set aside over $5,000 of the household's net income for payment of mortgage debt and utilities was unreasonable and warranted reduction).

[90]    See, e.g., In re Anes, 195 F.3d at 180–81 ("Voluntary contributions to retirement plans, however, are not reasonably necessary for a debtor's maintenance or support and must be made from disposable income.").

In 2005, Congress enacted BAPCPA with an aim towards preventing chapter 7 relief from being "'used as a first resort, rather than a last resort,'"[91] and to "'ensure that debtors repay creditors the maximum they can afford.'"[92]    The amendment sought to address these concerns in several ways.  First, the standard for dismissal was expressly reduced from "substantial abuse" to simply "abuse," and the presumption in favor of granting relief was deleted.[93]    Second, under the new subsection 707(b)(2), some chapter 7 cases are deemed presumptively abusive based on an objective mathematical formula for debtors whose monthly income exceeds the state median for their family size.[94]    Under the so-called "Means Test," a debtor's monthly *disposable income* is determined by deducting from current monthly income only those monthly expenses set forth in section 707(b)(2)(A)(ii), some of which are fixed amounts based on national standards and not the debtor's actual expenses.[95]    Other actual expenses may not be deducted at all.[96]    If a debtor's

---

[91]    Morse v. Rudler (In re Rudler), 576 F.3d 37, 40 (1st Cir. 2009) (quoting H.R. Rep. No. 109–31(I), at 4 (2005), reprinted in 2005 U.S.C.C.A.N. 88, 90).

[92]    Id. (quoting H.R.Rep. No. 109–31(I), at 1, reprinted in 2005 U.S.C.C.A.N. at 89).

[93]    Cf. 11 U.S.C. § 707(b) (1998) with 11 U.S.C. § 707(b)(1).  See, e.g., In re Boule, 415 B.R. 1, 5 (Bankr. D. Mass. 2009) (concluding that the omission of the word "substantial" was intended to convey a less stringent standard); In re Crink, 402 B.R. 159, 177 (Bankr. M.D.N.C. 2009) ("The standard for granting a motion to dismiss pursuant to Section 707(b)(3) is no longer 'substantial abuse,' but rather just 'abuse,' a lower standard."); In re Richie, 353 B.R. 569, 574 (Bankr. E.D. Wis. 2006) ("Gone is the word 'substantial'—now, a court may dismiss simply for abuse.").

[94]    11 U.S.C. § 707(b)(2), (7).

[95]    11 U.S.C. § 707(b)(2)(A)(ii).

[96]    See, e.g., In re Montalto, 537 B.R. 147 (Bankr. E.D.N.Y. 2015) (debtor could not deduct high speed internet service costs given that the expense was necessary for a non-dependent's job); In re Hammock, 436 B.R. 343, 351 (Bankr. E.D.N.C. 2010) (student loan repayments are precluded from reasonably necessary expenses under the IRS standards); In re Brace, 430 B.R. 513 (Bankr. N.D. Ill. 2010) (debtor was not entitled to deduct a monthly loan payment to his employee retirement plan as an "involuntary deduction" from income); In re Cleaver, 426 B.R. 390 (Bankr. D.N.M. 2010) (debtor could not deduct costs of basic telephone service as expense for telecommunications services means test form); In re Tauter, 402 B.R. 903 (Bankr. M.D. Fla. 2009) (debtor could not reduce his disposable income by amounts of his monthly contributions to retirement account and payments on loan taken from retirement account in performing means test calculation).

monthly disposable income falls above a certain range,[97] a presumption of abuse arises which may only be rebutted by demonstrating special circumstances.[98]

Finally, for cases in which no presumption of abuse arises or where the presumption has been successfully rebutted, the new subsection 707(b)(3) nonetheless requires the Court to consider: (A) "whether the debtor filed the petition in bad faith;"[99] or (B) whether "the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse."[100]   Use of the disjunctive "or" in this subsection indicates that the totality of the circumstances may signal "abuse" even where the chapter 7 petition was not filed in bad faith.[101]   The explicit textual connection between the "totality of the circumstances" and "the debtor's financial situation" in section 707(b)(3)(B) implies an analysis that "clearly encompasses a debtor's ability to pay" creditors.[102]   For this reason, it is universally accepted that section 707(b)(3) incorporates pre-BAPCPA concepts and that pre-BAPCPA case law remains instructive for determining abuse.[103]   Moreover, in light of the structural amendments to section 707(b), as well as the Congressional intent behind them, the Court concludes that the "hybrid" approach, as described by the First and Sixth Circuits, was effectively codified by BAPCPA in section 707(b)(3).[104]

---

[97]   11 U.S.C. § 707(b)(2)(A)(i).

[98]   11 U.S.C. § 707(b)(2)(B).

[99]   11 U.S.C. § 707(b)(3)(A).

[100]   11 U.S.C. § 707(b)(3)(B).

[101]   See In re Perelman, 419 B.R. 168, 177 (Bankr. E.D.N.Y. 2009) ("Section 707(b)(3) bifurcates 'bad faith' and 'totality of circumstances' as grounds for dismissal by listing them in separate subparagraphs phrased in the disjunctive.").

[102]   See In re Lenton, 358 B.R. 651, 663 (Bankr. E.D. Pa. 2006)

[103]   See Ng v. Farmer (In re Ng), 477 B.R. 118, 126 (B.A.P. 9th Cir. 2012); In re Weaver, 570 B.R. 596, 602 (Bankr. M.D. Tenn. 2017); In re Sivaram, 564 B.R. at 273; In re Roppo, 442 B.R. 888, 892 (Bankr. N.D. Ill. 2010); In re Boule, 415 B.R. at 5; In re Demesones, 406 B.R. 711, 714 (Bankr. E.D. Va. 2008); In re Reese, 402 B.R. 43, 51 (Bankr. M.D. Fla. 2008); In re Cribbs, 387 B.R. at 333.

[104]   The "per se" approach of the Eighth and Ninth Circuits is incompatible with the amended statutory directive to consider the "totality of the circumstances," though it may have been effectively codified as part of the Means Test.  Similarly, the Fourth Circuit's formulation of the "totality of the circumstances" test is based

Of course, all this raises the question of what it means for a debtor to have "ability to pay." Not surprisingly, courts generally agree that under the totality of the circumstances, an ability to pay means something more than simply having monthly disposable income. It instead suggests the ability to generate a return to creditors that is "meaningful" or "significant."[105] In concept, the doctrine is easily applied at its extremes—a potential 100% dividend to unsecured creditors through a 36-month chapter 13 plan is an abuse, while the inability to generate a dividend of any kind is clearly not.[106] Beyond that, opinions vary greatly.[107] In an attempt to define the low end of the spectrum, some courts have considered the 25% repayment threshold in section 707(b)(2)(A)(i)(I) a helpful tool for determining abuse given that it represents an amount Congress thought to be presumptively abusive for purposes of the Means Test.[108] There is also recognition of the fact that the amount of unsecured debt and the potential dividend are inversely proportional, suggesting a strictly mathematical formula is likely inappropriate.[109] Ultimately, the Court finds that the totality of the circumstances eschews bright-line concepts and that all factors, including

---

on a presumption in favor of the debtor that was intentionally removed from the statute, and otherwise appears inconsistent with bad faith expressly not being a requirement for dismissal under section 707(b)(3)(B). In comparison, the "hybrid" approach considers the totality of the circumstances, as the statute now expressly requires, but also places an emphasis on the ability repay creditors that is consonant with the amendment to section 707(b) overall. In any event, the Third Circuit has never addressed the meaning of "abuse" in this context, leaving the Court free to choose the appropriate standard.

[105]   See In re Lenton, 358 B.R. at 665; In re Pennington, 348 B.R. 647, 652 (Bankr. D. Del. 2006); In re Harshaw, 345 B.R. at 524; In re Wiedner, 344 B.R. at 327.

[106]   See, e.g., U.S. Trustee for W. Dist. of Virginia v. Harrelson, 323 B.R. 176 (W.D. Va. 2005); In re Shores, No. 1:09-BK-08905MDF, 2010 WL 5125328, at *7 (Bankr. M.D. Pa. Dec. 9, 2010); In re Lipford, 397 B.R. 320, 328 (Bankr. M.D.N.C. 2008); In re Zuccarell, 373 B.R. 508 (Bankr. N.D. Ohio 2007).

[107]   See In re Attanasio, 218 B.R. 180, 184 n.6 (Bankr. N.D. Ala. 1998) (collecting cases).

[108]   See In re Burbol, No. 1:09-BK-08317MDF, 2011 WL 890684, at *3 (Bankr. M.D. Pa. Mar. 9, 2011); In re James, 414 B.R. 901, 915 (Bankr. S.D. Ga. 2008); In re Mestemaker, 359 B.R. 849, 857 (Bankr. N.D. Ohio 2007); In re Pennington, 348 B.R. at 652; but see In re Pittman, 506 B.R. 496 (Bankr. S.D. Ohio 2014) (dismissing case for abuse where debtor could have paid 24% dividend to creditors); In re Stimmel, 440 B.R. 782, 785 (Bankr. N.D. Ohio 2010) (dismissing case for abuse where debtor could have paid 22% dividend to creditors).

[109]   In re Boule, 415 B.R. at 7–8; In re Allen, 411 B.R. 913, 922 (Bankr. S.D. Ga. 2009).

the potential dividend and the aggregate amount of debt that could be paid, must be weighed against the unique facts of each case.[110]

As previously suggested, the ability to pay is generally considered within the context of a hypothetical chapter 13 case.[111]  Chapter 13 is a comparatively stable and predictable environment for a debtor to make payments over time, making it an ideal testbed for this analysis.[112]  It affords debtors breathing room, which may be critical to permit ongoing payments, and forces creditors to wait and, at least potentially, accept less than full payment.  Outside of bankruptcy, a debtor's ability to repay obligations over time is largely dependent on the creditors' willingness both to accept such an arrangement and refrain from exercising remedies under applicable law.  Without the prospect of full repayment, creditors are more likely to race to the courthouse in the hopes of improving their position vis-à-vis other creditors.  In addition, debtors retain the unbridled discretion to pay creditors in differing amounts and frequency.  Thus, not only are there practical impediments to assessing the ability to pay outside bankruptcy, it promotes an

---

[110]    While the 25% repayment threshold contained within section 707(b)(2)(A)(i)(I) has some initial appeal as an objective yardstick, the Court must be careful not to interpret Congress' intent out of context.  It *may* be reasonable to conclude that Congress would view a chapter 7 filing as presumptively abusive where the debtor could provide general unsecured creditors a dividend of over 25% in a hypothetical chapter 13 case, but the totality of the circumstances would still provide the debtor an opportunity to rebut that presumption.  That is true even under the Means Test.  Moreover, it does not necessary follow that Congress would view a dividend of less than 25% as presumptively not abusive.

[111]    See In re Wright, 276 B.R. 399, 407 (Bankr. W.D. Pa. 2002) (under the totality of the circumstances, the debtors' expenses were not sufficiently excessive to warrant dismissal, particularly where the difference would not provide a meaningful distribution in chapter 13); see also In re Hoke, 447 B.R. 835, 837 (Bankr. N.D. Ohio 2011) ("A debtor's ability to pay is assessed generally by looking to the amount of disposable income the debtor has available, and whether that income could feasibly finance a Chapter 13 plan of reorganization."); In re Phillips, 417 B.R. 30, 43 (Bankr. S.D. Ohio 2009) (applying a hypothetical Chapter 13 analysis); In re Tucker, 389 B.R. 535, 538 (Bankr. N.D. Ohio 2008) ("As a component of a debtor's ability to pay, courts generally consider whether there would be sufficient income in excess of reasonably necessary expenses to fund a Chapter 13 plan."); In re Felske, 385 B.R. 649, 654 (Bankr. N.D. Ohio 2008) ("A frequently utilized measure, when determining whether a debtor has the ability to repay their debts, is to ascertain whether, under a hypothetical Chapter 13 repayment plan, the debtor could repay a meaningful percentage of his or her unsecured debts.").

[112]    In theory, the Court agrees that chapter 11 could be an appropriate yardstick for some cases, see In re Wiedner, 344 B.R. at 326, but is probably not a viable alternative in most in light of the greater filing fee and the requirement to pay quarterly fees to the United States Trustee.

inequality of distribution among similarly-situated creditors that is antithetical to the Code. None of this is to say that the Court should never consider a debtor's ability to pay outside bankruptcy, but merely that chapter 13 is best-suited for the analysis in most cases.[113]

In sum, the Court finds that dismissal for abuse under section 707(b)(3)(B) is warranted, but not required, where the debtor has an ability to repay creditors whose debts would otherwise be discharged without payment under chapter 7. The Trustee has the burden of establishing by a preponderance of the evidence that granting chapter 7 relief would be an abuse.[114] As a practical matter, the Trustee must, at a minimum, show that the debtor has income that could be used to fund a hypothetical chapter 13 plan. To be clear, abuse is not presumed by such a showing, but, if true, will be the primary factor driving the Court's consideration of the totality of the circumstances. Once the Trustee has carried this burden, it falls to the debtor to demonstrate facts refuting the specter of abuse and justifying chapter 7 relief.[115]

---

[113]    In fact, it is difficult to imagine circumstances – devoid of bad faith – where a debtor's ability to pay outside of bankruptcy would signal abuse warranting dismissal, but an analysis under chapter 13 would not.

[114]    DeAngelis v. Hoffman (In re Hoffman), 413 B.R. 191, 194 (Bankr. M.D. Pa. 2008); In re Lenton, 358 B.R. at 664-65.

[115]    Id.

### B.    Standards Applicable to Certain Expenses under Section 707(b)(3)(B)

In seeking dismissal for abuse based on the Debtors' ability to pay, the Trustee has primarily taken a categorical approach to objecting to certain expenses to establish the existence of disposable income.  This requires the Court to examine the nature of each challenged expense and determine the appropriate standard to be applied.  Only then will the expense have context for the Court's ultimate assessment of the totality of the circumstances.

Before delving into such an inquiry, however, the Court must first dispose of the Debtors' assertion that this approach imposes an "alternative means test" contrary to the Code. The Debtors concede, as they must, that section 707(b)(3)(B) expressly mandates consideration of the "totality of the circumstances . . . of the debtor's financial situation."[116]    They even acknowledge that pre-BAPCPA case law remains instructive for this purpose.  Nevertheless, there is a disconnect for them, which appears premised on two misapprehensions about the essence of the analysis.

First, the Debtors perceive the per se "disallowance" of expenses to be at odds with considering the totality of the circumstances.  The Court recognizes the *Motions to Dismiss* are susceptible to this interpretation, but that is not a conceptually accurate description of the matters before the Court.  Under this procedural posture, the Court is not "disallowing" anything, but is instead evaluating the Debtors' expenses for what is reasonably necessary for their maintenance and support.[117]    While context (the totality of the circumstances) will often inform what is reasonable and necessary, it is not difficult to envision types of expenses that would never be

---

[116]    11 U.S.C. § 707(b)(3)(B).

[117]    Admittedly, many Courts have utilized the word "disallow" to mean that an expense will not be "allowed" to be deducted from the Court's calculation of disposable income.  Clearly, the procedural posture only allows for a binary ruling with respect to dismissal and does not empower the Court to actually edit a debtor's monthly budget.

reasonable or necessary for a debtor.    In any event, if the Court finds that an expense is unreasonable or unnecessary, either contextually or categorically, the Court must still consider whether the availability of those funds under the totality of the circumstances renders the chapter 7 case an abuse.  Put simply, review of the expense is only the first part of the inquiry.

Second, the Debtors appear to suggest the appropriateness of their expenses has already been addressed through the Means Test.[118]  But this misunderstands the interplay between sections 707(b)(2) and 707(b)(3).[119]  The Means Test employs a mechanical formula using standardized expenses to filter out presumptively abusive filers, while the totality of the circumstances test is best understood as a second, more factually-intensive filter to ensure a lack of abuse.[120]  In sum, they are substantially different analyses that focus on different things.[121]

---

[118]    The Court notes that the Kubatkas, as below-median income debtors, were not required to complete the second half of the Means Test to determine their monthly disposable income.

[119]    See In re Perelman, 419 B.R. 168, 176 (Bankr. E.D.N.Y. 2009) ("the Debtor argues that he has already 'litigated' his ability to pay under the guise of the Means–Test and prevailed by passing the test, thereby debunking any presumption of abuse. . . . the Debtor points to nothing in the legislative history giving a clear indication of Congressional intent to make § 707(b)(2) the exclusive domain to determine ability to pay. On the contrary, the plain language of § 707(b)(3), read in conjunction with § 707(b)(1) and (2), is clear, and compels a conclusion that a court is mandated to consider a debtor's actual debt-paying ability where a presumption of abuse does not arise under the Means–Test. Indeed, so far as we are aware, every court that has considered the issue has determined that where an above-median debtor passes the Means–Test, a debtor's ability to pay still plays a critical role when applying the totality of circumstances test under § 707(b)(3).").

[120]    See In re Smith, 585 B.R. 168, 175 (Bankr. W.D. Okla. 2018) ("Unlike the mechanical formula provided by the Means Test, § 707(b)(3) allows the court to make a broad, flexible review encompassing any factors that are relevant to the debtor's financial condition, including post-petition events that affect a debtor's finances.").

[121]    See Kulakowski v. Walton (In re Kulakowski), 735 F.3d 1296, 1300 (11th Cir. 2013) ("Indeed, we have concluded that the totality of the circumstances test and the means test are not completely co-extensive."); Witcher v. Early (In re Witcher), 702 F.3d 619, 623 (11th Cir. 2012) ("The absence of an explicit preclusion regarding the ability to pay under § 707(b)(3)(B) in the face of Congress's awareness of judicial inclusion of the same factor under prior law indicates that Congress did not intend to preclude such consideration.").

1.    *Voluntary Retirement Account Contributions & Loan Repayments*

Given that the Trustee argues that *Anes v. Dehart* is dispositive with respect to the voluntary retirement account contributions and retirement account loan repayments, it is the natural starting point.  *Anes* involved two separate chapter 13 debtors who had taken out loans from their respective retirement systems and were required to pay them back.[122]  In both cases, the bankruptcy court sustained the chapter 13 trustee's objection to the proposed plan based on the idea that the retirement loan repayments made outside the plan meant that the debtors were not devoting all their projected disposable income to the plan as required by section 1325(b)(1)(B).[123]  On appeal, the Third Circuit agreed, reasoning:

> *The Court of Appeals for the Sixth Circuit has held that repayment of amounts withdrawn from retirement accounts is not reasonably necessary for a debtor's maintenance or support, requiring that payments be made, if at all, only after satisfaction of all unsecured debts. We agree.* If the Debtors do not make the proposed payments, the retirement systems will deduct the balance owed from their retirement accounts. The payments, even if classified as debt payments, therefore, will increase their retirement benefits rather than repay the retirement systems or ensure the viability of either pension system. In effect, the payments are contributions to the Debtors' retirement accounts. *Voluntary contributions to retirement plans, however, are not reasonably necessary for a debtor's maintenance or support and must be made from disposable income*. As one bankruptcy court explained in refusing to confirm a plan that proposed to make mortgage payments on non-residential property rather than satisfy unsecured creditors, "[a]lthough investments may be financially prudent, they certainly are not necessary expenses for the support of the debtors or their dependents. Investments of this nature are therefore made with disposable income; disposable income is not what is left after they are made." *Debtors' proposed payments, regardless of their financial prudence, must be understood as being made out of "disposable income" under the terms of their proposed plans*.[124]

---

[122]    In re Anes, 195 F.3d at 179.

[123]    Id. at 179-80.

[124]    Id. at 180–81 (citations omitted) (emphasis added).

26

Although *Anes* was a chapter 13 case, lower courts subsequently held that the Third Circuit's conclusion that voluntary retirement account contributions and loan repayments "were not reasonably necessary . . . and must be made from disposable income"[125] applied with equal force to "substantial abuse" determinations in chapter 7 cases.[126]

In 2005, BAPCPA added new provisions relating to retirement account contributions and loan repayments. First, section 1322(f) provides that "[a] plan may not materially alter the terms of a loan [from a qualified retirement plan] and *any amounts required to repay such loan shall not constitute 'disposable income' under section 1325*."[127] Next, section 541(b)(7) excludes from property of the estate any amount "withheld by an employer from the wages of employees for payment as contributions" to all qualified retirement accounts or "received by an employer from employees for payment as contributions" to a qualified retirement account.[128] Notably, these subsections are followed by oddly-worded hanging paragraphs that further provide "except that such amount under this subparagraph *shall not constitute disposable income as defined in section 1325(b)(2)*."[129] Without question, this language is awkward and curiously

---

[125]    Id.

[126]    See In re Harshaw, 345 B.R. at 527 ("voluntary retirement plan contributions are not reasonably necessary for a debtor's maintenance or support, that is that such contributions constitute disposable income that must be used by a debtor to repay his or her creditors."). To be clear, although the *In re Harshaw* decision is dated June 27, 2006, the case was commenced in 2004 and is therefore pre-BAPCPA.

[127]    11 U.S.C. § 1322(f) (emphasis added); see also 11 U.S.C. § 362(b)(19) (describing the type of loan applicable to section 1322(f)).

[128]    11 U.S.C. § 541(b)(7)(A), (B).  For purposes of this section, a qualified retirement account is:

    (I)    an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 or under an employee benefit plan which is a governmental plan under section 414(d) of the Internal Revenue Code of 1986;

    (II)    a deferred compensation plan under section 457 of the Internal Revenue Code of 1986; or

    (III)    a tax-deferred annuity under section 403(b) of the Internal Revenue Code of 1986;

Id.

[129]    Id. (emphasis added).

placed given that section 541 defines property of the estate and not disposable income in chapter 13.

Unfortunately, as is often the case with the BAPCPA amendments, this awkward language has yielded differences of opinion regarding the proper interpretation of section 541(b)(7). To date, three distinct analytical approaches have emerged. The vast majority of courts follow the *Johnson*[130] approach, interpreting section 541(b)(7) as unequivocally removing any qualifying amount that is either "withheld by" or "received by" a debtor's employer from the projected disposable income calculation under section 1325(b)(2).[131] The so-called *Prigge*[132] view, which has been adopted by the United States Court of Appeals for the Sixth Circuit and the United States Bankruptcy Appellate Panel for the Ninth Circuit, takes the opposite position and holds that post-petition retirement account contributions are always considered disposable income.[133] Finally, a third methodology occupying the middle ground between *Johnson* and *Prigge* holds that post-petition retirement account contributions are excluded from disposable income only to the extent to which contributions were already being made on the petition date.[134]

---

[130]    Baxter v. Johnson (In re Johnson), 346 B.R. 256 (Bankr. S.D. Ga. 2006).

[131]    See Miner v. Johns, 589 B.R. 51 (W.D. La. 2018); In re Garza, 575 B.R. 736 (Bankr. S.D. Tex. 2017); In re Cantu, 553 B.R. 565 (Bankr. E.D. Va. 2016), aff'd on other grounds sub nom. Gorman v. Cantu, 713 F. App'x 200 (4th Cir. 2017); In re Vanlandingham, 516 B.R. 628 (Bankr. D. Kan. 2014); In re Drapeau, 485 B.R. 29 (Bankr. D. Mass 2013); In re Paliev, 2012 WL 3564031 (Bankr. E.D. Va. Aug. 17, 2012); In re Egan, 458 B.R. 836 (Bankr. E.D. Pa. 2011); In re Roth, No. 10–13287, 2010 WL 2485951, at *2 (Bankr. D.N.J. Jun. 14, 2010); In re Gibson, No. 09–01196–JDP, 2009 WL 2868445, *2 (Bankr. D. Idaho Aug. 31, 2009); In re Padilla, No. 07–07495 ESL, 2009 WL 2898837, *2 (Bankr. D.P.R. June 23, 2009); In re Mati, 390 B.R. 11 (Bankr. D. Mass. 2008); In re Garrett, No. 07–3997–3F3, 2008 WL 6049236, *1 (Bankr. M.D. Fla. Jan. 18, 2008); In re Shelton, 370 B.R. 861 (Bankr. N.D. Ga. 2007); In re Oltjen, No. 07-60534-RCM, 2007 WL 2329695, at *3 (Bankr. W.D. Tex. Aug. 13, 2007); In re Nowlin, 366 B.R. 670 (Bankr. S.D. Tex. 2007), aff'd on other grounds, 576 F.3d 258 (5th Cir. 2009); In re Devilliers, 358 B.R. 849 (Bankr. E.D. La. 2007); In re Njuguna, 357 B.R. 689 (Bankr. D.N.H. 2006).

[132]    In re Prigge, 441 B.R. 667 (Bankr. D. Mont. 2010).

[133]    See Seafort v. Burden (In re Seafort), 669 F.3d 662 (6th Cir. 2012); Parks v. Drummond (In re Parks), 475 B.R. 703 (B.A.P. 9th Cir. 2012); In re McCullers, 451 B.R. 498 (Bankr. N.D. Cal. 2011).

[134]    See Burden v. Seafort (In re Seafort), 437 B.R. 204 (B.A.P. 6th Cir. 2010), aff'd on other grounds 669 F.3d 662 (6th Cir. 2012); In re Read, 515 B.R. 586 (Bankr. E.D. Wis. 2014); In re Jensen, 496 B.R. 615 (Bankr. D. Utah 2013); In re Bruce, 484 B.R. 387 (Bankr. W.D. Wash. 2012). This has been referred to as the *Seafort*

The minority views diverge from *Johnson*'s plain meaning approach based on several considerations.  For example, the Sixth Circuit started with the assumption that "that Congress's placement of 401(k) loan repayments *within* Chapter 13 itself and placement of the exclusion for voluntary retirement contributions elsewhere was deliberate."[135]  This, the Sixth Circuit reasoned, supported an inference that "Congress did not intend to treat voluntary 401(k) contributions like 401(k) loan repayments, because it did not similarly exclude them from 'disposable income' within Chapter 13 itself."[136]  Nevertheless, the Sixth Circuit recognized that the plain text of section 541(b)(7) "must provide *some* sort of protection for voluntary retirement contributions in Chapter 13 cases."[137]  Finding the placement of the "exclusion . . . outside the confines of Chapter 13" significant, its analysis turned to the interplay between sections 541(a)(1) and (b).[138]  Adopting the construction advanced by *In re McCullers*,[139] the Sixth Circuit imported the temporal component of section 541(a)(1)—"as of the commencement of the case"—into section 541(b), "suggest[ing] that section 541(b)(7) excludes from property of the estate only property that would otherwise be included in the estate under section 541(a)" at a fixed point.[140]  In other words, "the function of § 541(b)(7) was merely to clarify that pre-petition retirement contributions do not constitute property of the estate or post-petition disposable income."[141]  From

---

or *Seafort* Majority approach after the bankruptcy appellate panel's majority decision, but since the Sixth Circuit adopted the *Prigge* view on further appeal, use of such a moniker at this point would be needlessly confusing.

[135]   In re Seafort, 669 F.3d at 672 (emphasis in original).

[136]   Id.

[137]   Id. (emphasis in original).

[138]   Id. at 666.

[139]   In re McCullers, 451 B.R. at 503-04.

[140]   Id. at 672.

[141]   Id. at 673.

this perspective, postpetition retirement contributions are neither addressed by section 541(b)(7) nor section 1306, and thus are afforded no protection.[142]

Courts following the *Johnson* approach conclude that the minority views misconstrue section 541 by incorrectly reading the phrase "as of the commencement of the case" as relating to section 541(b).[143]  These courts infer that Congress intentionally omitted from section 541(b) any reference to the petition date.[144]  Moreover, they emphasize that section 1306 incorporates section 541 in its entirety into the definition of property of the estate in chapter 13 cases and not just section 541(a).[145]  As a result, they find no textual basis in either sections 541 or 1306 to suggest that the exclusions provided under section 541(b) would not be applicable postpetition.[146]  To the contrary, those courts posit that such an interpretation would be "both at odds with the plain meaning of § 1306 and the prospective nature of chapter 13 estates."[147]  Thus, the juxtaposition between the express treatment of retirement loan repayments in section 1322(f) and the absence of a similar chapter 13 provision addressing voluntary retirement contributions is insignificant because a chapter 13 provision would be merely duplicative of section 541(b)(7).[148]

Ultimately, the Court finds the *Johnson* approach employed by the majority of courts far more persuasive than the alternatives.  The Court agrees that the minority views apply a flawed reading of section 541 by placing a temporal restriction on section 541(b) where none exists.  Ironically, by doing so they ascribe too much significance to the absence of a chapter 13

---

[142]    Id. at 666-67.

[143]    See, e.g., In re Garza, 575 B.R. at 747; In re Drapeau, 485 B.R. at 36; In re Egan, 458 B.R. 845.

[144]    See, e.g., In re Garza, 575 B.R. at 748; In re Vanlandingham, 516 B.R. at 635; In re Egan, 458 B.R. at 848.

[145]    See, e.g., In re Garza, 575 B.R. at 749; In re Drapeau, 485 B.R. at 36; In re Egan, 458 B.R. at 845.

[146]    See, e.g., In re Garza, 575 B.R. at 748-49; In re Egan, 458 B.R. at 846

[147]    In re Egan, 458 B.R. at 845; see In re Vanlandingham, 516 B.R. at 635.

[148]    See, e.g., In re Garza, 575 B.R. at 748-49; In re Drapeau, 485 B.R. at 36.

provision devoted to retirement account contributions where one is unnecessary.  Notwithstanding the peculiarities in drafting and placement of this provision, this Court perceives no ambiguity in the directive that contributions to qualified retirement plans "shall not constitute disposable income."  Thus, the Court concludes that taken together, the effect of sections 541(b)(7) and 1322(f) is to exclude both voluntary retirement account contributions and loan repayments from "disposable income" in chapter 13 cases.

There can be little doubt that the enactment of sections 541(b)(7) and 1322(f) now preclude the same outcome reached in *Anes*.  Nevertheless, courts have been reluctant to conclude that *Anes* was abrogated by BAPCPA, noting that Congress did not provide that these payments are reasonably necessary for the maintenance and support of a debtor, but merely excluded them from disposable income under section 1325.[149]  Ultimately, whether *Anes* was abrogated or whether its rationale is simply no longer applicable to chapter 13 cases is perhaps a distinction without a difference.

Assuming *Anes* was not abrogated, and its holding regarding the reasonable necessity of voluntary retirement account contributions and loan repayments stands in chapter 7 cases (something that is far from clear), the remaining issue is whether sections 541(b)(7) and 1322(f) impact the outcome of an ability to pay analysis under section 707(b)(3)(B).  Without question, these provisions only apply in chapter 13 cases.  That said, an ability to pay analysis under section 707(b)(3)(B) is generally considered within the context of a hypothetical chapter 13

---

[149]    See In re Roth, 2010 WL 2485951, at *2 ("the holding in *In re Anes* has not been abrogated by 11 U.S.C § 1322(f) because the amendment does not provide that 401(k) loan repayments are reasonably necessary for the maintenance and support of the debtor"); In re Lenton, 358 B.R. at 659 ("I reject Debtor's assertion that the holding in *Anes* has been abrogated by post-BAPCPA § 1322(f). That section does not make any finding that 401(k) loan payments are reasonably necessary, but rather simply represents a Congressional choice to exclude them from the definition of disposable income under § 1325. To the extent that Debtor asks me to examine pre-BAPCPA law for guidance in determining whether retirement contributions are a necessary expense, I am clearly bound by *Anes*.").

case.[150]  Therefore, a strict application of *Anes* would yield the anomalous result that the Debtors'

retirement funds are counted as disposable income in disqualifying them from chapter 7, but

excluded from disposable income in chapter 13.

   The Trustee asserts that this outcome is simply a function of the difference between

chapters 7 and 13, a position that the Court finds frustratingly myopic.  Although he cites a string

of post-BAPCPA cases that considered retirement funds as part of an ability to pay analysis under

a section 707(b)(3)(B), the Court finds that upon a closer review these cases are less persuasive

than the Trustee would suggest.  Most do not discuss sections 541(b)(7) or 1322(f) despite

expressly evaluating the debtor's ability to pay in a hypothetical chapter 13.[151]  The remaining

three only provide limited support.  *In re Felske*,[152] *In re Pandl*,[153] and *In re Lenton*[154] all stand for

the proposition that it is appropriate to consider retirement account loan repayments as disposable

income notwithstanding section 1322(f) to the extent that the loan will be paid off and the funds

will become available during a hypothetical chapter 13 plan term.[155]

---

[150] *See* n. 111, supra.

[151] *See* In re Hilmes, 438 B.R. 897, 906 (N.D. Tex. 2010); In re Ng, No. 10-02001, 2011 WL 5925527, at *4 (Bankr. D. Haw. Nov. 28, 2011), aff'd, 477 B.R. 118 (B.A.P. 9th Cir. 2012); In re Hoke, 447 B.R. 835, 838 (Bankr. N.D. Ohio 2011); In re Jacob, 447 B.R. 535, 546 (Bankr. N.D. Ohio 2010); In re McClellan, 428 B.R. 737, 743 (Bankr. N.D. Ohio 2009); In re Speith, 427 B.R. 621, 625 (Bankr. N.D. Ohio 2009); In re Gonzalez, 378 B.R. 168, 173 (Bankr. N.D. Ohio 2007); see also In re Kaminski, 387 B.R. 190, 195 (Bankr. N.D. Ohio 2008) ("Rather, utilizing the 'disposable income' requirement for Chapter 13 plan confirmation as a guidepost—the term of which looks to the reasonable necessity of a debtor's expenditures—the Court may seek downward adjustments in a debtor's expenses where necessary.").

[152] In re Felske, 385 B.R. 649 (Bankr. N.D. Ohio 2008).

[153] In re Pandl, 407 B.R. 299 (Bankr. S.D. Ohio 2009).

[154] In re Lenton, 358 B.R. at 664.

[155] *See* In re Pandl, 407 B.R. at 302 ("§ 1322(f) is limited in its applicability to a debtor who has filed a Chapter 13 case, and including a debtor's 401(k) loan repayment in the context of determining abuse under § 707(b)(3) is appropriate, especially since 401(k) loan repayments are finite in length."); In re Felske, 385 B.R. at 659 ("The evidence presented to the Court shows that Mrs. Felske is scheduled to complete paying her 401(k) loan in approximately two years, after which time those funds would be available to fund a Chapter 13 plan."); In re Lenton, 358 B.R. at 664 ("[P]ayroll deductions for his Monthly Loan Payment and voluntary 401(k) contributions are untouchable in the context of a Chapter 13 plan. . . . The Second Loan will be paid off in August, 2009, providing an additional $364 per month for 17 months.").

The Court's own research reveals that those courts who have considered the impact of sections 541(b)(7) and 1322(f) on section 707(b)(3)(B) conclude that "[w]hen the basis for an attack on an individual's status as a Chapter 7 debtor is the ability to pay unsecured creditors in a hypothetical Chapter 13 case, it only makes sense that the analysis involve a realistic estimation of what the debtor would be required to pay in such a case under current law."[156]    In that sense, the Court has no trouble conceding that it is appropriate to recognize the temporal distinction between chapters 7 and 13, and consider the prospective availability of funds if retirement loan obligations naturally terminate.    What the Court cannot do is ignore the absurdity of finding a chapter 7 filing abusive solely based on the legal fiction that retirement funds are available when they are not actually required to be paid to creditors in chapter 13.    Therefore, contrary to the Trustee's assertions, the Court concludes that it *must not* consider the Debtors' voluntary retirement account contributions or retirement account loan repayments as disposable income when assessing their ability to pay under section 707(b)(3)(B) to the extent that those funds will not actually be available in chapter 13.

As a final word about retirement contributions in chapter 13, the Court observes that even under the *Johnson* approach, a debtor's ability to deduct these amounts from disposable income is not without its limits.    Generally, all debtors are required to proceed in good faith.[157]    In chapter 13 specifically, the plan must be proposed in good faith.[158]    Typically, bad faith cannot be

---

[156]    In re Phillips, 417 B.R. 30, 42 (Bankr. S.D. Ohio 2009); see In re Horn, No. 15-90240-BHL-7, 2016 WL 423781, at *4 (Bankr. S.D. Ind. Jan. 4, 2016); In re Salerno, 408 B.R. 554, 558 (Bankr. D. Conn. 2009); In re Latone, No. 4:08BK03311-EWH, 2008 WL 5049460, at *3 (Bankr. D. Ariz. Oct. 23, 2008); see also In re Lenton, 358 B.R. 664 (excluding from disposable income 401(k) contributions and loan repayments that would be "untouchable" in a Chapter 13 plan).

[157]    See, e.g., 11 U.S.C. §§ 707, 1225(a)(3), 1325(a)(3).

[158]    11 U.S.C. § 1325(a)(3).

inferred from conduct that is permitted by the Code,[159] but a debtor's retirement account contributions are a factor that may be considered under section 1325(a)(3).[160]  A good faith determination is "case-specific" and will likely rest on whether the contributions are within the legal limits for the employee benefit plan, and whether the "debtor has made contributions in similar amounts over an extended period of time."[161]  Obviously, if the deduction of a debtor's retirement account contributions evidence bad faith and would prevent confirmation of a chapter 13 plan, the same deduction would evidence bad faith in chapter 7, warranting dismissal under section 707(b)(3).  Here, however, the Trustee has not alleged bad faith.

### 2.    *Student Loans*

The primary thrust of the Trustee's objection to the Debtors' expenses for student loan repayments is that they are not expenses at all, but debts.[162]  As a debt, a student loan obligation is simply a general unsecured claim, albeit a presumptively nondischargeable one.  The

---

[159]    See NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.), 384 F.3d 108, 127 (3d Cir. 2004).

[160]    See Miner v. Johns, 589 B.R. at 62 (a good faith "inquiry requires the Bankruptcy Court to evaluate a proposed plan in its entirety, which would include a debtor's retirement contributions as set forth within the plan."); In re Drapeau, 485 B.R. at 38 ("In sum, the Court holds that § 541(b)(7) excludes postpetition voluntary contributions to the retirement plans and annuities specified therein from the scope of disposable income under § 1325(b)(2), so long as made in good faith."); In re Egan, 458 B.R. at 850–51 (the court may consider facts involving retirement contributions in determining a debtor's good faith under section 1325(a)(3)); In re Mati, 390 B.R. at 17 (retirement contributions are a factor to be considered under the totality of the circumstances to assess whether the plan was proposed in good faith); In re Gibson, 2009 WL 2868445, at *3 (although a debtor may take advantage of what the law provides, "a debtor may not completely shelter available resources in a retirement plan at the expense of his creditors."); In re Shelton, 370 B.R.at 867 ("BAPCPA expressly limited the application of § 541(b)(7) to one particular paragraph, § 1325(b)(2)," so "it does not necessarily follow that Congress intended to handicap the courts' good faith inquiries or unintentionally create a proverbial 'loophole.'"); In re Jones, 2008 WL 4447041, at *4 ("the fact the Debtors are contributing to a retirement plan can be considered in analyzing their good faith in proposing their plan."); In re Johnson, 346 B.R. at 263 (finding no bad faith so long as a debtor's retirement contributions are within the legal limits of the employee benefit plan).

[161]    See In re Drapeau, 485 B.R. at 38–39.

[162]    Notably, the fact that student loan obligations are debts is precisely why they are not permitted to be deducted as expenses on the Means Test.  See 11 U.S.C. § 707(b)(2)(A)(ii)(I).

core principles underlying the Bankruptcy Code require that it be provided similar treatment to similarly situated claims.[163]  As a result, courts have regularly held that a debtor may not provide more preferential treatment to student loan obligations than is afforded general unsecured claims.[164]  This rationale has been applied in the context of section 707(b)(3)(B) to conclude that student loans are not reasonably necessary expenses and that the funds devoted to their repayment must be considered as part of the debtor's ability to pay.[165]  Frankly, the Debtors' policy arguments offer little in response to the weight of authority.

Nevertheless, the case law recognizes the prohibition against a debtor favoring their student loan debts is not absolute.[166]  Indeed, courts have recognized that it may be appropriate to not count a debtor's monthly student loan payments as disposable income where: (1) "there existed a large student-loan obligation which, given its nondischargeable character, would continue to increase in principal during the duration of a Chapter 13 plan;" and (2) the distribution to debtor's other unsecured creditors under a hypothetical chapter 13 plan would be minimal.[167]  In the Court's

---

[163]    See In re Combustion Eng'g, Inc., 391 F.3d 190, 239 (3d Cir. 2004), as amended (Feb. 23, 2005); Kimmelman v. The Port Authority of NY and NJ (In re Kiwi Int'l Air Lines, Inc.), 344 F.3d 311, 316 (3d Cir. 2003).

[164]    See, e.g., Groves v. LaBarge (In re Groves), 39 F.3d 212, 216 (8th Cir. 1994) ("[W]e disagree with the proposition that a Chapter 13 debtor's interest in a 'fresh start' justifies separately classifying student loans for the sole purpose of preferentially repaying those accelerated debts to the prejudice of other unsecured claims . . . the nondischargeability of student loan claims, by itself, does not justify substantial discrimination against other, dischargeable unsecured claims in a Chapter 13 plan."); Bentley v. Boyajian (In re Bentley), 266 B.R. 229 (B.A.P. 1st Cir. 2001) (chapter 13 plan discriminated unfairly by proposing to pay debtors' nondischargeable student loan obligations in full but to pay all other nonpriority unsecured claims a dividend of approximately three percent).

[165]    See McGowan v. McDermott, 445 B.R. 821, 826 (N.D. Ohio 2011); In re Stackhouse, 582 B.R. 445, 451–52 (Bankr. S.D. Ohio 2018); In re Rooney, 436 B.R. 454, 459 (Bankr. N.D. Ohio 2010); In re Jordan, 428 B.R. 430, 435 (Bankr. N.D. Ohio 2010); In re MacNamara, No. 1:08-BK-03895MDF, 2009 WL 1606985, at *5 (Bankr. M.D. Pa. June 5, 2009); In re Kaminski, 387 B.R. at 197; see also In re Thompson, 457 B.R. 872, 883–84 (Bankr. M.D. Fla. 2011) (monthly expenses cannot include any payments for debts); In re Dowleyne, 400 B.R. 840, 847 (Bankr. M.D. Fla. 2008) (same).

[166]    In re Jordan, 428 B.R. at 436.

[167]    Id.; see In re Brenneman, 397 B.R. 866, 874 (Bankr. N.D. Ohio 2008); In re Thurston, No. 07-35092, 2008 WL 3414138, at *6 (Bankr. N.D. Ohio Aug. 8, 2008).

view, this is not so much an exception to the rule, but merely an evaluation of the totality of the circumstances and an acknowledgment that a debtor's ability to pay should be material if the case is to be dismissed for abuse.

Accordingly, the Court agrees with the Trustee and finds that categorically monthly student loan payments must be considered disposable income in an ability to pay analysis under section 707(b)(3)(B).

### 3.    *Prepetition Taxes*

Much like the challenge to the Debtors' monthly student loan payments, the Court presumes the Trustee's issue with the Harmses listing an IRS payment plan as an expense is that it prioritizes payment to one creditor over others.  Without question, similarly situated claims are entitled to similar treatment.[168]  Legally, however, the IRS holds a priority tax claim under section 507(a)(8) and is the only priority claim listed on Schedule E/F.[169]  Therefore, there can be no categorical objection to its treatment because it is in a class of its own.

That said, staying true to the Court's observation that it should consider the prospective availability of funds if a retirement loan obligation naturally terminates,[170] the Court should similarly consider under the totality of the circumstances the prospective availability of funds upon the completion of the IRS payment plan.

### 4.    *Educational Expenses for Adult Child*

---

[168]    In re Combustion Eng'g, Inc., 391 F.3d at 239; In re Kiwi Int'l Air Lines, Inc., 344 F.3d at 316.

[169]    See *Schedule E/F: Creditors Who Have Unsecured Claims*, Case No. 18-22406-GLT, Dkt. No. 1 at 20.

[170]    See Part IV.B.1, supra.

It is universally accepted that "[s]upport for adult children or contributions to their college education are generally not reasonable expenses in the context of section 707(b)(3)(B)."[171] The rationale is simple and obvious: "educational expenses for adult children are discretionary and are not expenses that should be foisted upon a debtor's pre-petition creditors."[172]  Notably, Delval does not disagree, but instead argues that under the totality of the circumstances the expense is minimal.

### 5.   *Second Vehicle Expense*

The Trustee has taken the position that the Kubatkas' monthly maintenance expense for their existing vehicle is not reasonably necessary because they are also deducting from their disposable income a "projected car payment" for a second vehicle they intend to acquire.  As stated above, he does not elaborate why that is the case.  As such, for the sake of completeness, the Court simply notes that there is no case law to support the proposition that a second car expense is necessarily unreasonable.

### C.   <u>The Totality of the Circumstances</u>

Having defined the standards applied to the expenses at issue, the Court must now consider the totality of the circumstances—that is, weigh "every aspect" of the case—to determine whether the filing of any of the present chapter 7 cases constitute an abuse.[173]  In this context, the Court construes "abuse" to mean an improper use of the bankruptcy system to take unfair

---

[171]    In re Schumacher, 495 B.R. 735, 741 (Bankr. W.D. Tex. 2013); see In re Hodge, No. 12-35236, 2014 WL 1419852, at *5 (Bankr. N.D. Ohio Apr. 11, 2014); In re Linville, 446 B.R. 522, 530 (Bankr. D.N.M. 2011); In re Patterson, 392 B.R. 497, 506 (Bankr. S.D. Fla. 2008); U.S. Trustee v. Harrelson, 323 B.R. 176, 179 (Bankr. W.D. Va. 2005); In re Shaw, 311 B.R. 180, 184 (Bankr. M.D.N.C. 2003); In re Miller, 302 B.R. 495, 502 (Bankr. M.D. Pa. 2003); In re Staub, 256 B.R. 567, 571 (Bankr. M.D. Pa. 2000); In re Stallman, 198 B.R. 491 (Bankr.W.D. Mich. 1996); In re Goodson, 130 B.R. 897 (Bankr. N.D. Okla. 1991).

[172]    In re Staub, 256 B.R. at 571.

[173]    See In re Truax, 446 B.R. 638, 642 (Bankr. S.D. Ga. 2010).

advantage of one's creditors.[174]  Although the totality of the circumstances is inherently incapable

of being reduced to an exhaustive list, factors traditionally considered by courts include:

(1)   Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;

(2)   Whether the debtor incurred cash advances and made consumer purchases far in excess of their ability to repay;

(3)   Whether the debtor's family budget is excessive or unreasonable;

(4)   Whether the debtor's expenses can be reduced significantly without deprivation of adequate food, clothing, shelter, and other necessities;

(5)   Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition;

(6)   Whether the debtor enjoys a stable source of future income;

(7)   Whether the debtor has the ability to repay debts out of future earnings;

(8)   Whether an attempt to repay debts would be easy, difficult, or wholly unfeasible;

(9)   Whether the debtor is eligible for chapter 13;

(10)   Whether there are state remedies with the potential to ease the financial predicament and the degree of relief obtainable through private negotiations; and

(11)   Whether the petition was filed in good faith.[175]

---

[174]   See In re Green, 934 F.2d at 570; In re Crink, 402 B.R. at 165 ("Abuse of the Bankruptcy Code occurs under Section 707(b) when a debtor attempts to use the provisions of the Code to get a 'head start' rather than a 'fresh start.'"); In re James, 345 B.R. 664, 667 (Bankr. N.D. Iowa 2006) ("I consider an abuse to be a misuse of the bankruptcy provisions, to use them wrongly or improperly.").

[175]   See In re Green, 934 F.2d at 572; In re Krohn, 886 F.2d at 126–27.

Moreover, if an ability to pay analysis requires the "diversion" of funds from the monthly payment of student loans, the court must consider whether and to what degree the student loan obligation is likely to increase in principal during the duration of a chapter 13 plan.[176]

The Court stresses that the totality of the circumstances requires a holistic approach, not "a mathematical application of a checklist."[177]  It also bears repeating that while an ability to pay is a "primary" consideration under the totality of the circumstances, it is not necessarily conclusive.  Indeed, the question is not whether the debtor can pay, but whether the debtor's ability to pay renders the chapter 7 filing an abuse.  Thus, context is key.

### 1.    *The Kubatkas*

In this case, the Trustee alleged an ability to pay, challenging the Kubatkas' voluntary retirement contributions, monthly maintenance expense for the Nissan, and monthly student loan payments.  For the reasons stated above, the Court finds that the voluntary retirement contributions will not be considered disposable income for purposes of section 707(b)(3)(B),[178] but their monthly student loan payments are debt payments that should be made from disposable income.[179]  This leaves only the monthly maintenance expense for the Nissan.

As the Court has repeatedly noted, the Trustee has not articulated any justification for why he believes the Kubatkas cannot have both a maintenance expense for a car they presently own and a "projected car payment" for a vehicle they need to acquire.  Nevertheless, the Kubatkas have represented that both expenses are reasonable and necessary because they currently have only one vehicle for a family of five, and a second one will be needed for Mrs. Kubatka to return to

---

[176]    See In re Jordan, 428 B.R. at 436.

[177]    In re Truax, 446 B.R. at 642.

[178]    See Part IV.B.1, supra.

[179]    See Part IV.B.2, supra.

work as a traveling nurse. The Trustee did not object to these representations or request an evidentiary hearing. Accordingly, based on the facts on hand, the Court finds both vehicle expenses reasonable and necessary for the support of the Kubatkas' family under the totality of the circumstances.

The Trustee has not identified any other allegedly unreasonable expenditures, and, upon review, the Court finds the Kubatkas' expenses appropriate. Realistically, there is likely some fat that could be and, given their negative monthly net income, will have to be trimmed from their budget. Nevertheless, for a family of five, no expense listed on Schedule J appears unnecessary or unreasonably high.

On the income side of the equation, the Court notes that the Kubatkas' chapter 7 filing was a result of Mrs. Kubatka being unable to work for over a year due to complications arising from her pregnancy. She has now returned to work as a nurse and there is no allegation that she is underemployed. The Court is also mindful that if Mr. Kubatka, who is the primary caregiver for their three young children, were to obtain employment outside the home to increase their household income, it would likely result in substantial a new expense for child care.

Ultimately, the Trustee having demonstrated the availability of some funds, the Court must now determine how that translates into an ability to repay creditors. This requires the Court to calculate the Kubatkas monthly disposable income by adding their monthly student loan payment of $515 to their monthly net income of -$100.30, which yields $414.70. As below median income debtors, their hypothetical applicable commitment period would be thirty-six months.[180] Multiplying their monthly disposable income of $414.70 by the thirty-six month plan term reveals an ability to pay $14,929.20 through a chapter 13 plan, providing a dividend of approximately

---

[180]    See 11 U.S.C. § 1325(b)(4)(A)(i).

13.55% to unsecured creditors totaling $110,164.83.  The Court notes, however, that the Kubatkas' student loans are $85,516, representing approximately 77% of their total unsecured debt.  This means that non-student loan general unsecured creditors total $24,648.83 and would receive less than $3,340.33 in the aggregate.[181]

While the Kubatkas' undeniably have some ability to pay, the Court does not find it particularly significant.  In order to provide a return that is both minimal in the aggregate and as a percentage of the debt to a modest amount of general unsecured claims, they would be required to redirect their monthly student loan payments.  As a result, the amount of their student loan obligations would increase due to insufficient payments.  The record is inadequate for the Court to estimate that impact over the plan term, but given that the aggregate amount payable to the dischargeable claims is less than $3,340.33, it is likely that after the increased charges are taken into account, the net benefit of the trade is substantially less.  Thus, in the absence of any allegation or indicia of bad faith, the Court does not find the Kubatkas' ability to pay under "the totality of the circumstances . . . of [their] financial situation demonstrates abuse."[182]

### 2.    *Delval*

In Delval's case, the Trustee alleged an ability to pay by recharacterizing her voluntary retirement contributions, retirement account loan repayments, and educational expenses for her adult daughter as disposable income.  Again, for the reasons stated above, the Court will not consider the retirement funds as disposable income in a hypothetical chapter 13.[183] Theoretically, if the retirement account loan could be paid off during a hypothetical chapter 13

---

[181]    This calculation does not take into account the chapter 13 trustee's commission earned from acting as a disbursing agent under the plan.

[182]    11 U.S.C. § 707(b)(3)(B).

[183]    See Part IV.B.1, supra.

case, the Court could count those funds as available for the remainder of the plan term.  As there are no facts in the record to indicate when that would occur, the Court finds that the Trustee has failed to carry his burden to demonstrate this expense may actually generate available funds in the future.

Delval concedes that educational expenses for an adult child are not reasonably necessary.  Beyond that, the Trustee has not argued that any other expenses are unreasonable or unnecessary.  Upon a review of Schedule J, Delval's monthly expenses appear few and meager.  In fact, her expenses are so low that it is doubtful she could reduce them without significant deprivation of necessities.  Accordingly, the Court finds Delval's expenses, other than her daughter's educational expenses, are reasonable and necessary for her support.

For these reasons, only the educational expenses must be recharacterized as disposable income.[184]  Therefore, if the Court adds the $175 back to Delval's monthly net income of -$56, it yields monthly disposable income of $119.  As an above median income debtor, her hypothetical applicable commitment period would be sixty months.[185]  If her disposable income is paid over sixty months pursuant to a chapter 13 plan, this yields $7,140, providing less than a 11% dividend to the total unsecured debt in the amount of $64,650.69.  The aggregate amount received by the dischargeable general unsecured claims, which amount to $50,686.82, would be less than $5,597.83.  Divided among seventeen creditors over five years, the Court acknowledges the potential distribution is not especially significant.

That said, the above calculation nonetheless establishes that Delval has an ability to pay that is not theoretical or, like the Kubatkas, dependent on the diversion of funds from one

---

[184]     See Part IV.B.4, supra.

[185]     See 11 U.S.C. § 1325(b)(4)(A)(ii).

debt to another.  To the contrary, her current budget, which is admittedly tight, suggests that $175 is available for the repayment of creditors each month.  While this technically weighs in favor of a finding of abuse, its impact is blunted by the fact that these funds come solely from secondary employment.  Without voluntarily working a second job, Delval's monthly disposable income would be $340 less, or a *negative* $221 per month.  Notably, the Trustee has not alleged that Delval is under employed at her primary employer, where she has worked fulltime for the last thirty years. The Court is therefore reluctant to view this excess income in a manner that effectively penalizes her for going "above and beyond" to bridge the gap in her budget, which already appears to have no margin for error.  At very least, the present scenario does not intimate that Delval is improperly taking advantage of her creditors by means of the chapter 7 process.  Thus, under these circumstances, her ability to pay, though real, does not rise to the level of an abuse.

In sum, the Court finds that the dismissal of Delval's chapter 7 case is not warranted under the totality of the circumstances of her financial situation.

### 3.    *The Harmses*

In the Harmses' case, the Trustee alleged an ability to pay by challenging the Harmses' voluntary retirement contributions, monthly student loan payments, and the payments to the Internal Revenue Service pursuant to a prepetition payment plan.  Like the Kubatkas, the Court finds that their voluntary retirement contributions will not be considered for purposes of section 707(b)(3)(B),[186] but their monthly student loan payments must be counted as disposable income.[187] Because the Internal Revenue Service is the only priority creditor in this case, the preferential

---

[186]    See Part IV.B.1, supra.

[187]    See Part IV.B.2, supra.

treatment afforded the IRS payment plan by treating it as a monthly expense is irrelevant.[188] Nevertheless, because that obligation is finite, the Court must consider any funds that would become available during the hypothetical plan term after the obligation terminates.

The Harmses' expenses appear reasonable and necessary, though perhaps slightly understated.[189]  The Trustee does not argue otherwise or allege that they are under employed. Having explained that the financial hardship was caused by Mrs. Harms' loss of employment in 2017 and the corresponding 36% reduction in household income, the Court does not discern any bad faith in this chapter 7 filing.

To calculate the Harmses' monthly disposable income, the Court must first add the monthly student loan payment of $515 to their monthly net income of -$34.52, which yields $480.48.  As an above-median income debtors, their hypothetical applicable commitment period would be sixty months.[190]  Thus, multiplying $480.48 over the plan term results in $28,828.80. Turning to the IRS payments, if the total amount of the priority claim is $1,326.80, and the monthly payments are $75, then the obligation will be paid in full in eighteen months.  That means $75 will be available for the remaining forty-two months of the hypothetical plan term.  Consequently, the Harmses can devote an additional $3,150 to a hypothetical plan, bringing the pot to $31,978.80. With general unsecured claims in the amount of $117,679.70, the potential dividend is approximately 27%.  As a result, dischargeable general unsecured claims will receive about $14,678.48 in the aggregate.  The Court notes that this is above the 25% threshold for presumptive abuse under the Means Test.[191]

---

[188]    See Part IV.B.3, supra.

[189]    For example, the Harmses have not listed an expense for telephone, cell phone, internet, and cable services.

[190]    See 11 U.S.C. § 1325(b)(4)(A)(ii).

[191]    See 11 U.S.C. § 707(b)(2)(A)(i)(I).

The Court is mindful that most of this funding comes from the partial diversion of student loan payments. Unfortunately, there is no evidence in the record that gives the Court any basis to estimate the consequence of the Harmses only paying about 54% of their monthly student loan obligation. Unlike the Kubatkas, whose plan contribution was so minimal that the increased student loan debt arising from nonpayment would almost certainly have materially reduced the significance of the potential return, the contemplated payment to creditors from the Harmses is substantially greater in both the aggregate amount and as a percentage of the total debt. This means the student loan obligation could increase substantially before meaningfully reducing the import of the payment to the other general unsecured creditors. For this reason, the Court cannot find on this record that the weight of the Harmses' ability to pay is offset by the effect of not paying their monthly student loan obligations in full.

The Trustee having satisfied his initial burden to show the availability of funds available for the repayment of creditors, it fell to the Harmses' to demonstrate an entitlement to relief. They failed to do so. Thus, although the Court finds no bad faith in the Harmses' chapter 7 filing, it concludes that their ability to repay creditors is significant enough that allowing them to obtain a chapter 7 discharge would be an abuse under the totality of the circumstances.

## V.    CONCLUSION

In light of the foregoing, the Court will deny the *Motions to Dismiss* with respect to the Kubatkas and Delval, but grant the *Motion to Dismiss* with respect to the Harmses, effective in fourteen days unless they convert their case to chapter 13 before that date.    This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.    The Court will issue a separate order consistent with this opinion.

ENTERED at Pittsburgh, Pennsylvania.

Dated:  September 30, 2019

sjb

GREGORY L. TADDONIO
UNITED STATES BANKRUPTCY JUDGE

Case administrator to mail to:
George Conway, Esq.
Bryan Keenan, Esq.
Kenneth Steinberg, Esq.